UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:

LIBERTY BRIDGE CAPITAL MANAGEMENT
GP, LLC, *et al.*,

                                    Debtor.

------------------------------------------------------------x

KENNETH P. SILVERMAN, Chapter 7 Trustee of
LIBERTY BRIDGE CAPITAL MANAGEMENT,
GP, LLC, *et al.*,

                                    Plaintiff,

            – v –

CAROB BEAN REALTY CORP. II and LIBERTY
BRIDGE PROPERTIES, LLC,

                                    Defendants.

------------------------------------------------------------x

Chapter 7

Case No.: 20-10009 (JPM)
(Jointly Administered)

Adv. Pro. No. 20-01190 (JPM)

**Memorandum Opinion and Order on Plaintiff's Motion for Summary Judgment Under Federal Rule of Civil Procedure 56 and Federal Rule of Bankruptcy Procedure 7056, and Defendant Carob Bean Realty Corp. II's Cross Motion for Summary Judgment**

*A P P E A R A N C E S :*

**RIMÔN PC**
*Counsel for Chapter 7 Trustee Kenneth P. Silverman*
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
By:     Anthony Charles Acampora
        Meghan Lavine
        David J. Mahoney

**TARTER KRINSKY & DROGIN LLP**
*Counsel for Carob Bean Realty Corp. II*
1350 Broadway
New York, New York 10018
By:     Alexander Tiktin
        David H. Wander

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**[1]

This is an adversary proceeding arising in the bankruptcy *In re: Liberty Bridge Capital Management GP, LLC, et al.*, Case No. 20-10009 (Jan. 3, 2020). Before the Court is the *Motion for Summary Judgment Under Federal Rule of Civil Procedure 56 and Federal Rule of Bankruptcy Procedure 7056* filed by Kenneth P. Silverman ("Plaintiff"), Chapter 7 Trustee of Liberty Bridge Capital Management GP, LLC (the "Debtor"). [Doc. 28]; *see also* [Doc. 30] (Plaintiff's *Memorandum of Law in Support of the Trustee's Motion for Summary Judgment*, and collectively with [Doc. 28], the "Motion"). The Motion seeks generally to void the $280,000 deposit (the "Down Payment") that the Debtor's co-debtor, Cash4Cases, Inc. ("Cash4Cases"), paid to Carob Bean Realty Corp. II (the "Defendant") for property located at 134 East 38th Street, New York, New York (the "Premises").[2] *See* [Motion, Doc 30, p. 2]; [Ch. 11 Dkt., Doc. 288, p. 1 n.1].

Filed in response to the Motion is the *Defendant's Memorandum of Law (A) In Support of Cross-Motion for Summary Judgment and (B) In Opposition to Trustee's Motion for Summary Judgment* (the "Response") filed by Defendant. [Doc. 32]. The Response both opposes the Motion and requests summary judgment in favor of Defendant. *See* [Response, Doc. 32, p. 6].

---

[1]    Unless otherwise specified, references to "[Doc. __]" are to filings entered in the adversary proceeding *Kenneth P. Silverman, Esq., Chapter 7 Trustee of Liberty Bridge Capital Management GP, LLC, et al. v. Carob Bean RealtyCorp. II*, Case No. 20-01190 (June 23, 2020). References to "[Ch. 11 Dkt., Doc. __]" are to filings entered in the bankruptcy case *In re: Liberty Bridge Capital Management GP, LLC Cash4Cases, Inc., et al.,* Case No. 20-10009 (Jan. 3, 2020).

References to "Bankruptcy Rule __" are to the Federal Rules of Bankruptcy Procedure. References to "Local Rule __" are to the Local Bankruptcy Rules for the Southern District of New York. References to "Bankruptcy Code" refer to Title 11 of the U.S. Code (11 U.S.C.).

[2]    Although the Trustee's Complaint names Liberty Bridge Properties, LLC ("LBP") as a defendant, *see generally* [Doc. 1], LBP has not participated in this matter to any degree, and LBP's sole principal, Jaeson Birnbaum ("Mr. Birnbaum") is in prison. *See United States v. Birnbaum*, Case No. 21-cr-00595 (United States District Court for the Southern District of New York, September 28, 2021) [Doc. 9] (the transcript from Mr. Birnbaum's plea hearing). The Court therefore treats Carob Bean as the sole defendant in this adversary proceeding.

After careful consideration, and for the reasons set forth below, the Court finds that the

Debtor is an alter ego of Cash4Cases, and the zoning variance provided by Defendant constituted

fair consideration in exchange for the Down Payment.  Accordingly, because fair consideration

was provided for the transfer, the Trustee is unable to recover under New York Debtor and Creditor

Law ("DCL") Sections 273–76.  For substantially the same reasons, the Court finds that the Trustee

is unable to recover for its constructive fraud claim under Section 548(a)(1)(B) of the Bankruptcy

Code.  Finally, given Defendant's good faith and the value provided for the Down Payment, the

Court concludes that Defendant is entitled to the protections provided by Section 548(c) of the

Bankruptcy Code with respect to the actual fraud claim arising under Section 548(a)(1)(A).

Accordingly, the Motion is DENIED, and Defendant's cross-motion for summary judgment is

GRANTED.

## I.    FACTUAL BACKGROUND

Cash4Cases is a corporation organized in 2007 under the law of New Jersey and

registered as a foreign business organization in accordance with the law of New York.  *See*

[Defendant's *Counter-Statement of Undisputed Facts Pursuant to Bankruptcy Rule 7056 and

Local Rule 7056-1*, hereinafter "Def. Counter-Statement," Doc. 33, pp. 2–3].  Cash4Cases was

one of several wholly owned entities created by Jaeson Birnbaum ("Mr. Birnbaum") as part of an

enterprise involving the provision of litigation funding for personal injury cases.[3]  *See* [the

---

[3]        More specifically, the Trustee has described Cash4Cases' (and its affiliates') business as involving:

[the] funding [of] nonrecourse, pre-settlement litigation advances [] to permit personal injury
litigants during the duration of their pending litigation [] to finance essential and basic living
expenses and to subsidize unfunded medical costs associated with the prosecution of these Actions.
These Litigation Advances are collateralized by the proceeds of these Actions resulting from either
the settlement of the Actions or the determination of a jury after trial [].

[Ch. 11 Dkt. Doc. 23, pp. 2–3].

Trustee's *Counter-Statement of Undisputed Material Facts Pursuant to Bankruptcy Rule 7056 and Local Rule 7056-1*, hereinafter "Trustee 7056 Counter-Statement," Doc. 39, p. 2]; *see also* [Def. Counter-Statement, Doc. 33, pp. 2–3] (noting that Mr. Birnbaum is Cash4Cases' sole shareholder). In 2021, Mr. Birnbaum was charged with (and later plead guilty to) one count of securities fraud arising from this enterprise. *See United States v. Birnbaum*, Case No. 21-cr-00595 (Southern District of New York, September 28, 2021) [Doc. 2] ("[Mr. Birnbaum] solicited and obtained more than $3 million in investments for Cash4Cases based on fraudulent misrepresentations . . . in the form of promissory notes . . . [that] purported to provide the relevant investors with a security interest in the recoveries associated with certain [] lawsuits that were ostensibly purchased, in whole or in part, by Cash4Cases.").

Mr. Birnbaum is also the sole member of LBP, a non-debtor limited liability company organized under the law of New York in 2019. [Def. Counter-Statement, Doc. 33, p. 3]. It is undisputed that LBP was formed for the sole purpose of purchasing the Premises for use as an office for Cash4Cases and its affiliates.[4] *See* [Trustee 7056 Counter-Statement, Doc. 39, p. 2]; *see also* [Doc. 1, p. 3] (describing LBP as a "shell company created by Birnbaum . . . [that] does not and never [] conduct[ed] any business of any kind"). Although LPB was to hold title to the Premises, Mr. Birnbaum intended for Cash4Cases to pay for the Premises' mortgage on LBP's behalf. [Trustee 7056 Counter-Statement, Doc. 39, p. 8].

On March 8, 2019, LBP entered into a contract (the "Sale Contract") with Defendant to purchase the Premises for $2,800,000. [Def. Counter-Statement, Doc. 33, p. 4]; [Doc. 28-3]. The

---

[4]    Notably, LBP never received any initial investment or capitalization, never maintained its own bank account, never held assets or property of its own, never published its existence in local newspapers (as required under New York law), and possessed the same phone number and address as Cash4Cases. [Trustee 7056 Counter-Statement, Doc. 39, p. 5].

Sale Contract required a $280,000 Down Payment, which Cash4Cases provided on behalf of LBP on March 6, 2019. [Def. Counter-Statement, Doc. 33, pp. 3–5]. The Sale Contract also obligated Defendant to acquire a zoning variance prior to the closing that would allow the Premises to operate as an office. [Def. Counter-Statement, Doc. 33, p. 3].

On or about May 6, 2019, LBP received a mortgage commitment letter from ConnectOne Bank for the purchase of the Premises. [Def. Counter-Statement, Doc. 33, p. 5]. That letter defined LBP as the "Borrower" but described Mr. Birnbaum and Cash4Cases as the "primary obligors" of the mortgage. *Id.*

Defendant subsequently applied for and received the zoning variance contemplated by the Sale Contract, a process that required the expenditure of $228,570.14. *id.* at pp. 4, 6 (noting that Defendant received the zoning variance on October 10, 2019). Although Defendant was ready and willing to close after receiving the zoning variance, LBP and Mr. Birnbaum ultimately lacked the funds necessary to consummate the sale. *id.* at p. 4. In accordance with the terms of the Sale Contract, Defendant thereafter retained the $280,000 Down Payment and sold the Premises to a third party for $2,150,000, an amount $650,000 less than that contemplated by the Sale Contract. [Trustee 7056 Counter-Statement, Doc. 39, pp. 6, 9].

## II.   **PROCEDURAL HISTORY**

On January 3, 2020, Cash4Cases and seven of its affiliates—but not LBP—filed petitions for chapter 7 relief in the United States Bankruptcy Court for the Southern District of New York. [Def. Counter-Statement, Doc. 33, p. 2]. Those cases were approved for joint administration in an order dated January 10, 2022. *See* [Ch. 11 Dkt., Doc. 8]; [Def. Counter-Statement, Doc. 33, p. 2]. On November 16, 2021, the bankruptcy estates of eight of Mr. Birnbaum's entities were substantively consolidated under *In re Liberty Bridge Capital Management, GP, LLC, et al.*, Case

20-10009 (Jan. 3, 2020).[5]  *See* [Def. Counter-Statement, Doc. 33, p. 2]; [Ch. 11 Dkt., Doc. 287].

The Trustee commenced this adversary proceeding on June 23, 2020.  [Def. Counter-Statement,

Doc. 33, pp. 6–7].

The Trustee filed the instant Motion on January 18, 2024.  The Motion argues that the

Down Payment paid by Cash4Cases on behalf of LBP constitutes a fraudulent conveyance

avoidable under New York DCL Sections 273–76 and Section 548 of the Bankruptcy Code.  *See*

[Motion, Doc. 30, pp. 2, 6] ("As Cash4Cases was not a party to the contract under which the

Transfer was made, there is no argument that Cash4Cases received ***any*** consideration . . . .")

(emphasis in original).  In support of this position, the Trustee alleges that: (i) the issuance of the

Down Payment was not supported by fair consideration; (ii) Cash4Cases was insolvent at the

time the Down Payment was made; (iii) Cash4Cases was left with unreasonably small capital

---

[5]      Importantly, filed in support of the Debtor's *Motion for an Order Approving Substantive Consolidation of Certain Estates Pursuant to 11 U.S.C. § 105 and Rule 1015(b) of the Federal Rules of Bankruptcy Procedure* [Ch. 11 Dkt., Doc. 247] is an affidavit executed by an accounting consultant (the "Ryniker Declaration") who testified as follows:

> Each of the Debtors is commonly owned by Jaeson Birnbaum [], either directly or through entities controlled by Birnbaum, and prior to the Petition Date, Birnbaum was solely in control of each of the Debtors . . . Birnbaum operated the Debtors without properly recording transactions for each company in an appropriate structure such as a general ledger or subledgers, such that the respective assets and liabilities of each Debtor are impossible to accurately determine.  Although the Debtors held separate bank accounts, *most accounts payable of the Debtors were paid directly by* [*Cash4Cases*] and no intercompany transfers were made or recorded by the Debtors on their books as intercompany obligations.  Notwithstanding the foregoing, Birnbaum often freely transferred funds between the Debtors on an as-needed basis without any written agreements between the Debtors relating to such transfers . . . Based upon my discussions with various creditors of the Debtors' estates, as well as a review of proofs of claim filed against the Debtors, I believe that the Debtors' largest creditors *understood that all of the Debtors operated as a single economic unit for all purposes* and did not rely on the Debtors' separateness in their extension of credit . . . [and] I believe that the Debtors' smaller creditors, which did less investigation into the Debtors' financial affairs prior to advancing credit, were not made aware of the Debtors' corporate structure and only dealt with a single entity, [Cash4Cases].

*See* [Ryniker Declaration, Ch. 11 Dkt., Doc. 247-1, pp. 3–6] (emphasis added).

after the transfer; and (iv) Cash4Cases knew or should have known at the time of the Down Payment that it was incurring debts it could not repay. *Id.* at pp. 6–9.

The Response, however, argues that Cash4Cases and LBP are alter egos of one another, and notes that "LPB . . . received reasonable equivalent value for the transfer as the Down Payment gave LPB a $280,000 interest in the [Sale Contract] . . . ." [Response, Doc. 32, pp. 6–8, 18–19] (noting further that the zoning variance "cost Defendant a quarter of a million dollars"). Defendant thus argues that the fair consideration provided to LBP constituted fair consideration to Cash4Cases, and the Trustee therefore cannot recover under either DCL Sections 273–76 or Section 548(a)(1)(B) of the Bankruptcy Code. *Id.* at pp. 6–7. Additionally, with respect to the claims asserted under Section 548, Defendant also contends that it is a transferee in good faith and thus entitled to the protections provided by Section 548(c) of the Bankruptcy Code. *Id.* at p. 9; *see also id.* at p. 17 ("[T]he record is barren of any red flag Defendant ignored relating to the solvency of [Cash4Cases] or LBP, nor does Plaintiff even allege any such red flag existed. Rather, the record shows that Defendant was an arms-length seller in a garden-variety real estate transaction . . . .").

The Court held a hearing (the "Hearing, and the audio recording of the Hearing, the "Hearing Recording") with respect to both the Motion and the Response on July 8, 2024.

## III.   <u>JURISDICTION</u>

Because this is a post-petition action brought by a trustee within the context of an ongoing bankruptcy, the Court possesses "arising in" jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. *See* 11 U.S.C. § 1334(b) (providing federal courts with "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11"); *In re JJ Arch LLC*, 2024 WL 2933427, at *7 (Bankr. S.D.N.Y. June 10, 2024) ("Proceedings 'arise in' a title 11 case where a party asserts 'claims that . . . would [not exist] outside of the

bankruptcy.'"). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H). *See Executive Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 33 (2014) ("For core proceedings, the statute contains a nonexhaustive list of examples, including—as relevant here—'proceedings to determine, avoid, or recover fraudulent conveyances.'") (citing 28 U.S.C. § 157(b)(2)(H)); *see also Stern v. Marshall,* 564 U.S. 462, 474–75 (2011) ("Parties may appeal final judgments of a bankruptcy court in core proceedings to the district court, which reviews them under traditional appellate standards."); *cf.* 28 U.S.C. § 157(c)(1) (providing that, in non-core matters, a bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court" for review).

## IV.   <u>ANALYSIS</u>

### A. <u>Summary Judgment Standard</u>

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[6] A fact is "material" if it is capable of "influencing the case's outcome under governing substantive law," and a dispute is "genuine" where the evidence in the record "would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). When determining whether summary judgment is proper, the Court cannot "weigh the evidence, assess the credibility of witnesses, or resolve issues of fact" and must instead "draw all factual inferences in the light most favorable to the nonmoving party . . . ." *Rodriguez v. City of N.Y.*, 72 F.3d 1051,1061 (2d Cir. 1995) (citations and internal quotation marks omitted).

---

[6]     Rule 56 of the Federal Rules of Civil Procedure is made applicable to adversary proceedings by operation of Bankruptcy Rule 7056.

**B. <u>Alter Ego</u>**

Under New York law, the separate existence of a corporation is not lightly disregarded. *In re Stage Presence, Inc.*, 592 B.R. 292, 302 (Bankr. S.D.N.Y. 2018), *aff'd* 2019 WL 2004030 (S.D.N.Y. May 7, 2019) (citing *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979)). Accordingly, courts may only disregard corporate separateness in limited instances—namely, when the corporate form "has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego." *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979) (citing *Port Chester Elec. v. Atlas*, 40 N.Y.2d 652, 656, 389 N.Y.S.2d 327, 331, 357 N.E.2d 983, 986 (1976)); *Walkovszky v. Carlton*, 18 N.Y.2d 414, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966)).

When determining the existence of an altar ego relationship, courts typically consider the following factors:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991). While the *Passalacqua* factors are useful guideposts, "they cannot be applied in a vacuum, and the court must conduct a broad-based inquiry into the totality of the facts to determine if the party seeking to pierce the corporate veil has established an improper domination of the corporation." *New York*

*State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 303 (2d Cir. 2014).  The "ultimate question" when considering whether to pierce the corporate veil is whether "the policy behind the presumption of corporate independence and limited shareholder liability—encouragement of business development—is outweighed by the policy justifying disregarding the corporate form—the need to protect those who deal with the corporation."  *New York State Elec. & Gas Corp.*, 766 F.3d at 224 (citing *Passalacqua*, 933 F.2d at 139) (internal citations omitted).

Here, Defendant claims that "the record contains overwhelming evidence establishing that LBP was the alter ego of [Cash4Cases] [because] LBP had no separate existence . . . [and] LBP's sole [] purpose [was] to hold property where [Cash4Cases] would operate its business." [Response, Doc. 32, pp. 11–14] (arguing that LBP meets nine of the ten factors set forth in *Passalacqua*).  The Trustee argues in response that Defendant's argument is predicated "upon a single statement by . . . [Mr.] Birnbaum, that he considered [LBP and Cash4Cases] as one entity," taking the position that any reliance on Mr. Birnbaum's testimony is incredible given that he pled guilty to securities fraud prior to this bankruptcy.  [Doc. 40, pp. 5–6].

The Court agrees with Defendant.  As a threshold matter, the parties do not dispute that LBP satisfies a majority of the factors enumerated by the Second Circuit in *Passalacqua Builders,* 933 F.2d at 139.  More specifically, it is undisputed that:

> (i)    with respect to Factor 1—the absence of corporate formalities—LBP did not once engage in corporate recordkeeping, and never published its existence as a limited liability company as required by the law of New York, *see* [Trustee 7056 Counter-Statement, Doc. 39, pp. 5–6];
>
> (ii)   regarding Factor 2—inadequate capitalization—LBP "never received any initial investment or subsequent capitalization . . . [and] never maintained its own bank account, never possessed any funds of its own, and never had any assets," *see id.* at p. 5;
>
> (iii)  as to Factor 5—the existence of a "common office space, address and telephone numbers of corporate entities"—LBP possessed "no office space

nor property of its own and [actually] shared the same address and phone number as Cash4Cases," *see id.*;

(iv)     with respect to Factor 9—the "payment . . . of debts of the dominated corporation by other corporations"—Cash4Cases paid the down payment on behalf of LBP, which was the primary (if not the only) expense incurred by LBP prior to this bankruptcy, *see id.* at p. 3; *see also id.* at p. 8 (noting that, with respect to Mr. Birnbaum's other wholly owned entities, Cash4Cases likewise "paid most accounts payable of its Debtors");

(v)     regarding Factor 10—whether one corporate owned "property that was used by[an]other [] corporations as if it were its own"— it is undisputed that Mr. Birnbaum "intended for Cash4Cases to operate its offices and for its employees to work from the Premises," *id.* at p. 8.

Most notably, under Factors 4 and 6—the degree of managerial overlap between two companies and the degree of "business discretion" exercised by the subordinate entity, respectively—it undisputed that Cash4Cases and LBP enjoyed a complete "overlap in ownership, officers, directors, and personnel" because both Cash4Cases and LBP "had no officers or employees other than [Mr.] Birnbaum." [Trustee 7056 Counter-Statement, Doc. 39, p. 6]. Indeed, as their sole principal, Mr. Birnbaum dictated the corporate purpose for both companies, and specifically created LBP as a "single-purpose entity, formed solely to purchase the Premises" for the benefit of Cash4Cases and its affiliates.[7] [Trustee 7056 Counter-Statement, Doc. 39, p. 5]. The fact that Mr. Birnbaum formed LBP to perform a singular, limited function on behalf of another solely owned entity is strong evidence of an alter ego relationship, particularly given the

---

[7]     The Trustee believes the sixth *Passalacqua* factor (the business discretion exercised by an allegedly subordinate entity) does not weigh in favor of an alter ego finding. *See* [Trustee 7056 Counter-Statement, Doc. 39, p. 5] (arguing that Mr. Birnbaum "formed LBP for the independent purpose of purchasing the Premises within which a separate entity (Cash4Cases) would operate its discrete business"). However, the fact that LBP was created to function solely as the owner of Cash4Cases' place of business, *see id.* at p. 8, indicates quite clearly that LBP's existence depended entirely upon Cash4Cases' continued operation. For this reason, the Court believes that LBP did not possess any independent business discretion and instead conducted itself according to the operative needs of Cash4Cases and, relatedly, of Mr. Birnbaum. Accordingly, the sixth *Passalacqua* supports a finding of an alter ego relationship.

relationship Cash4Cases had with its co-debtors. [8]  *See Keawsri v. Ramen-Ya Inc.,* 2023 WL 5950685, at *7 (S.D.N.Y. Sept. 13, 2023) (considering one party an alter ego of another where, *inter alia*, there was "almost complete, if not complete, overlap between the management of [one party] and the management of [the other]"); *In re Montclair Homes*, 200 B.R. 84, 99–100 (Bankr. E.D.N.Y. 1996) (same).

---

[8]   As noted above, the Trustee moved for substantive consolidation with respect to the estates of Cash4Cases and seven of its affiliates, a motion that the Court granted on November 16, 2021. *See* [Def. Counter-Statement, Doc. 33, p. 2]; *see also* [Ch. 11 Dkt., Doc. 287, p. 10] (where the Trustee argues that Cash4Cases and its affiliates were "operated by [Mr. Birnbaum] as one collective unit"); *In re Augie/Restivo baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988) (noting that substantive consolidation depends two considerations, namely "(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit . . . or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors").

In support of that motion, the Trustee submitted the Ryniker Declaration, which stated:

> Each of the Debtors is commonly owned by Jaeson Birnbaum [], either directly or through entities controlled by Birnbaum, and prior to the Petition Date, Birnbaum was solely in control of each of the Debtors . . . Birnbaum operated the Debtors without properly recording transactions for each company in an appropriate structure such as a general ledger or subledgers, such that the respective assets and liabilities of each Debtor are impossible to accurately determine. Although the Debtors held separate bank accounts, *most accounts payable of the Debtors were paid directly by* [*Cash4Cases*] and no intercompany transfers were made or recorded by the Debtors on their books as intercompany obligations. Notwithstanding the foregoing, Birnbaum often freely transferred funds between the Debtors on an as-needed basis without any written agreements between the Debtors relating to such transfers . . . Based upon my discussions with various creditors of the Debtors' estates, as well as a review of proofs of claim filed against the Debtors, I believe that the Debtors' largest creditors *understood that all of the Debtors operated as a single economic unit for all purposes* and did not rely on the Debtors' separateness in their extension of credit . . . [and] I believe that the Debtors' smaller creditors, which did less investigation into the Debtors' financial affairs prior to advancing credit, were not made aware of the Debtors' corporate structure and only dealt with a single entity, [Cash4Cases].

*See* [Ryniker Declaration, Ch. 11 Dkt., Doc. 247-1, pp. 3–6] (emphasis added). While the Trustee did not move for consolidation with respect to LBP (perhaps because LBP possessed neither assets nor creditors), this testimony indicates that—much like LBP—Mr. Birnbaum disregarded corporate formalities relating to the operation of Cash4Cases' affiliates. *See id.* More importantly, a fair reading of the record suggests that—much like with LBP— both creditors *and Mr. Birnbaum* considered Cash4Cases' affiliates to exist as part of the broader "Cash4Cases" enterprise. *See id.*; *see also* [Doc. 34, p. 55] (where, at his deposition, Mr. Birnbaum states that he considered both LBP and the Cash4Cases affiliates to be "one entity because the operations of all the entities were combined"); [Doc. 28-4, pp. 2, 7, 29] (where, in its loan commitment letter, ConnectOne Bank describes LBP as a "Borrower" wholly owned by Mr. Birnbaum, but lists Cash4Cases and Mr. Birnbaum as "Guarantors" that were the "primary obligors" as to the loan for the Premises).

Given these similarities, the Court finds that the substantive consolidation of the estates of Cash4Cases and its affiliate co-debtors also evidences an alter ego relationship with respect to Cash4Cases and LBP.

Finally, as noted above, the applicability of the alter ego doctrine depends ultimately upon whether "'the policy behind the presumption of corporate independence and limited shareholder liability—encouragement of business development—is outweighed by the policy justifying disregarding the corporate form—the need to *protect those who deal with the corporation*.'" *New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014) (emphasis added) (citing *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)).

In this case—and as already noted—the Trustee concedes that LBP, one of several entities solely owned by Mr. Birnbaum, existed exclusively to purchase and own the Premises that Cash4Cases intended to use as office space. *See* [Trustee 7056 Counter-Statement, Doc. 39, pp. 2–3]; [Doc. 1, p. 3] (describing LBP as a "shell company created by Birnbaum . . . [that] does not and never [] conduct[ed] any business of any kind"). Thus, as admitted in the Motion and as stated by the Trustee at the Hearing held July 8, 2024, Mr. Birnbaum never intended for LBP to operate as a business, but instead as an ownership vehicle that could shield the Premises from claims asserted against Cash4Cases and its affiliates. *See* [Hearing Recording, at 1:20:00–21:20]. Indeed, the Trustee has argued that:

> There is ample evidence that [LBP] was created for the sole purpose of purchasing the [Premises] with monies from Cash4Cases to conceal debtor assets from its legitimate creditors, for the sole benefit of Jaeson Birnbaum [], the principal of LBP, Cash4Cases, and the other Debtors. LBP is not the alter ego of Cash4Cases, as alleged by Defendant. Rather LBP serves one purpose, to allow an insolvent corporation, Cash4Cases, to divert its operating capital to purchase an asset in the name of the entirely separate entity, LBP, which was not capitalized, had no creditors, and no other business relationships, so that the asset could grow in value away from the grasp of the Debtors' creditors.

[Doc. 40, p. 4]; *see also id.* at p. 9 (arguing that "LBP was created by Birnbaum to defraud the creditors of Cash4Cases"). LBP was thus an entity without a proper business purpose, and

existed from the first as a means of insulating the Property from liabilities incurred by Mr.
Birnbaum's operative entities.  For this reason, the Court finds that any concerns relating to the
policy of "business development" are outweighed the policy of "protect[ing] those who deal[t]
with" Cash4Cases and its affiliates—including the Defendant in this adversary proceeding, a party
that, as discussed *infra*, Part IV(C)–(E), provided fair consideration and reasonably equivalent
value in exchange for the Down Payment.  In light of this finding, and in accordance with the
application the *Passalacqua* discussed above, the Court finds that there is no genuine dispute of
material fact on this issue, and therefore finds that LBP should be considered an alter ego of
Cash4Cases.[9]

### C. Constructive Fraud Under the New York DCL

The DCL is New York's version of the Uniform Fraudulent Conveyance Act ("UFCA").[10]

*See In re Sharp Intern. Corp*, 403 F.3d 43, 53 (2d Cir. 2005).  As noted above, the Trustee argues

---

[9]      As a final matter, the Trustee cites *Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey,*
130 F.3d 52 (2d Cir. 1997), for the proposition that "Defendant assumed the risk associated with accepting payment
from [Cash4Cases] for the benefit of LBP."  *See* [Doc. 40, p. 9] (arguing further that "public policy requires a finding
that LBP and Cash4Cases are separate entities" because "[t]o hold otherwise would insulate third parties from the
ramifications of their receipt of a fraudulent conveyance to the further detriment of legitimate creditors . . . .").

In *Finley*, the Second Circuit considered whether an insurance broker was an "'initial transferee' within the meaning
of 11 U.S.C. § 550(a) . . . when the broker [simply] transferred the premium payment from the policyholder to the
insurance company."  *Finley*, 130 F.3d at 52–53.  Noting that Section 550(a) imposes strict liability upon an "initial
transferee," the Second Circuit held that the insurance broker was a "mere conduit" rather than "the recipient to whom
the funds ultimately should go" and therefore could not be held liable for the payment of the premium.  *See id.* at 56–
59 ("Numerous courts have recognized the distinction between the initial recipient—that is, the first entity to touch
the disputed funds—and the initial transferee under section 550.").

The facts before the Court do not present a case of a "mere conduit," as it is undisputed that Defendant was the party
who was ultimately intended to benefit from the payment of the Down Payment.  More importantly, while Defendant
may be an "initial transferee" within the meaning of Section 550(a), *Finley* did not consider the applicability of the
defense provided by Section 548(c), which the Court finds insulates Defendant from liability under the facts of this
case.  *See infra*, Part IV(E).  *Finley* is thus inapposite.

[10]      The New York DCL was updated in 2020, but because the Down Payment occurred prior to those revisions,
the most recent version of the DCL is inapplicable.  [Trustee 7056 Counter-Statement, Doc. 39, p. 3].  This opinion
therefore refers to the DCL as of March 6, 2019, the date of the Down Payment.

that the transfer should be voided as a constructively fraudulent transfer pursuant to DCL

Sections 273–75.  [Motion, Doc. 30, p. 6].  Under the DCL, constructive fraud exists where a

transfer occurs without adequate consideration during a time in which:

> (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275.

*In re Sharp Intern. Corp*, 403 F.3d at 53 (2d Cir. 2005); *see also* N.Y. Debt. & Cred. Law § 276

(McKinney 2019) (providing the remedies to a creditor who successfully prosecutes an action

under DCL Sections 273–75).

A transfer can be constructively fraudulent "regardless of the intent of the transferor."  *Id.*

(citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 633 (2d Cir.1995)).[11]  The burden of proof for

all DCL claims is a preponderance of the evidence.  *Kim v. Ji Sung Yoo*, 311 F.Supp.3d 598, 610

(S.D.N.Y. 2018).

The absence of "fair consideration" is a prerequisite to any form of constructive fraud under

the DCL.  *See* N.Y. Debt. & Cred. Law, §§ 273–75 (McKinney 2019); *see also In re Singh*, 434

B.R. 298, 309 (Bankr. E.D.N.Y. 2010) (noting that the term "fair consideration" in DCL Sections

273–75 incorporates the definition of "fair consideration under [] DCL § 272"); *American*

*Federated Tile Corporation v. GFI Management Services, Inc.*, 716 F.Appx. 23, 25 (2d Cir. 2017)

---

[11]    The prior version of DCL 276 imposes liability for "conveyance[s] made and [] obligation[s] incurred with actual intent . . . to hinder, delay, or defraud either present or future creditors . . . ."  N.Y. Debt. & Cred. Law § 276 (McKinney 2019).  Although the Trustee's complaint cites to this provision and alleges that the Down Payment was "made with the actual intent to hinder, delay or defraud Cash4Cases' creditors," *see* [Doc. 1, p. 6], it is undisputed for the purposes of this Motion that "there were no facts which would have put Defendant on notice that Cash4Cases was insolvent or would have been rendered insolvent by [Cash4Cases'] payment of the [Down Payment]."  [Trustee 7056 Counter-Statement, Doc. 39, p. 9].  The Court thus assumes that the Trustee's reference to "actual intent" is a reference to the intent of Mr. Birnbaum and Cash4Cases rather than that of Defendant.

(describing DCL Section 272 as a "building block" to be used in conjunction with other sections

of the DCL).

Under DCL Section 272, "fair consideration" exists:

a. [w]hen [given] in exchange for such property, or obligation, as a fair equivalent
therefor, and in good faith, property is conveyed or an antecedent debt is satisfied,
or

b. [w]hen such property, or obligation is received in good faith to secure a present
advance or antecedent debt in amount not disproportionately small as compared
with the value of the property, or obligation obtained.

N.Y. Debt. & Cred. Law § 272 (McKinney 2019). Accordingly—and as relevant here—a debtor

receives "fair consideration" under DCL Section 272(a) when a transferee: (i) either "convey[s]

property in exchange or [] discharge[s] an antecedent debt in exchange;" and (ii) provides the

debtor with the "fair equivalent of the property received . . . in good faith." *HBE Leasing Corp. v.

Frank*, 61 F.3d 1054, 1058–59 (2d Cir. 1995) (internal quotations omitted).

### i. *Indirect Benefit*

It is well-established (and intuitive) that "when a transferee gives [] consideration to a third

party [rather than the debtor], the debtor ordinarily will not have received fair consideration in

exchange for its property." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 630 (2d Cir. 1995). The

Second Circuit has, however, consistently held that a transferee is immune from constructive fraud

claims if the debtor receives an *indirect* benefit from a transaction that otherwise confers "fair

consideration" upon a third party. *See Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 991–93

(2d Cir. 1981).[12]   Where a debtor is alleged to have received an indirect benefit, a quantitative

analysis is typically required, as "nominal consideration will not suffice as fair consideration."

*MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Services Co.*, 910 F. Supp. 913, 937

(S.D.N.Y. 1995); *but see HBE Leasing Corp.*, 48 F.3d at 638–39 (finding that, under the facts of

that case, that a "quantitative approach, [which would] require[] some measurement of the value

of the benefit to each [party], is not applicable").   Accordingly, to determine whether a debtor

indirectly received fair consideration, the fact-finder must "attempt to measure the economic

benefit that the debtor indirectly received from the entire transaction, and then compare that benefit

to the value of the property the debtor transferred." *HBE Leasing Corp.*, 48 F.3d at 638–39 (citing

*Rubin*, 661 F.2d at 993).

---

[12]      *Rubin* involved a network of money order businesses whereby two affiliates (USN and UMO) guaranteed
loan advances made to three other affiliates (National, TWO, and Propper). *See* 661 F.2d 979, 981–87 (2d Cir. 1981)
(describing the affiliates' business as a "sort of private bank enterprise . . . that provide[d] banking-type services
primarily to lower-income persons who d[id] not maintain ordinary checking accounts"). When National, TWO, and
Propper defaulted on the loans guaranteed by USN and UMO, the lender seized and sold the assets that USN and
UMO had pledged as collateral. *Id.* at 986. After USN and UMO filed for bankruptcy, the trustees for their estates
disputed the lender's entitlement to those proceeds, arguing that their guarantee obligations were "unsupported by fair
consideration" because "the [loan] advances [to National, TWO, and Propper] did not confer any benefit upon USN
and UMO . . . .". *Id.* at 992. The district court rejected this argument.

The Second Circuit agreed with the district court, finding that USN and UMO likely benefited from the guarantee-
guarantor relationship because the loans provided the liquidity necessary to fund the *entire enterprises'* cycle of cash
orders—notwithstanding the fact that National, TWO, and Propper were the direct recipients of the loans. *See id.* at
993 ("[T]he district court did not err in rejecting the trustees' argument that the corporate separateness of the loan
recipients from their guarantors necessarily precluded a finding of fair consideration."). Given this relationship, *Rubin*
held that the advances to National, TWO, and Propper "very likely did facilitate transfers of funds from those firms
to the bank account shared by USN and UMO, benefiting [all] of those firms to some degree . . . ." *Id.* at 991–93
("[T]he simple fact that National, TWO, and Propper, rather than USN and UMO, received the loan [] advances need
not compel a ruling in favor of the trustees . . . .").

Although *Rubin* itself addressed a constructive fraud claim asserted under the Bankruptcy Act, *see id.* at 987, its
holding has since been extended to claims arising under state law. *See HBE Leasing Corp. v. Frank,* 48 F.3d 623, 637
(2d Cir. 1995) ("While *Rubin* has most often been applied in cases decided under the fraudulent conveyance provisions
of federal bankruptcy law, its approach to indirect benefits is equally applicable under the parallel provisions of the
UFCA.").

The Court finds that, in this case, Cash4Cases received "fair consideration" in return for its issuance of the Down Payment.  It is undisputed that:

(i)    under the Sale Contract, Defendant was obligated to acquire a land use variance to rezone the Premises as office space prior to closing, *see* [Doc. 28-3, p. 9]; [Trustee 7056 Counter-Statement, Doc. 39, p. 3];

(ii)   Defendant did in fact acquire that variance at a cost of approximately $228,570.14, [Trustee 7056 Counter-Statement, Doc. 39, p. 3]; and

(iii)  although the Sale Contract provided LBP with the right to purchase the Premises, LBP at all times intended to use the Premises for the benefit of the Cash4Cases' enterprise, *see id.* at pp. 2, 5.

Under these circumstances, Cash4Cases did not, as the Trustee argues, "receive[] nothing in return" for its issuance of the Down Payment.  *See* [Doc. 40, p. 8].  Rather, the $280,000 Down Payment provided LBP—an affiliate and alter ego of Cash4Cases—the right to close on the Premises, i.e., the right to purchase real property intended to benefit Cash4Cases and its other

17

affiliates.[13]  For this reason, and given the relative parity between the Down Payment and the

costs incurred by Defendant in acquiring the variance, the Court concludes that Cash4Cases

received "fair consideration" within the meaning of the DCL.  *See In re Gonzalez,* 342 B.R. 165,

173 (Bankr. S.D.N.Y. 2006) ("[T]he fair market value received by the debtor need not be a

penny for penny exchange, but can be 'roughly' the value of the transfer made.") (internal

citations omitted); *In re Jesup & Lamont, Inc.,* 507 B.R. 452, 472 (Bankr. S.D.N.Y. 2014) ("A

finding of reasonably equivalent value does not require an exact equivalent exchange of

---

[13]      To the extent the Trustee believes that the Sale Contract and its attendant Down Payment failed to "preserve[]" the net worth of Cash4Cases under *Rubin*," *see* [Doc. 40, p. 8], the Court disagrees.

As already discussed, the circumstances surrounding LBP's existence, as well as its function in the greater Cash4Cases enterprise (namely, its limited role as the prospective owner of the Premises), indicate that LBP was an alter ego of Cash4Cases.  *See supra*, Part IV(B).  Because the Court has already found that the entities' corporate separateness should be disregarded, any benefit to LBP was necessarily a benefit to Cash4Cases.  *See McNellis v. Raymond*, 420 F.2d 51, 52 (2d Cir. 1970) (affirming a decision that both pierced a corporate veil and found fair consideration because "there is substantial evidence which establishes an identity of interest between" two affiliated parties); *Mayo v. Pioneer Bank & Tr. Co*., 270 F.2d 823, 830 (5th Cir. 1959) (finding "fair consideration" because "[t]here was such a degree of identity and commingling of affairs between the corporation and its sole stockholder [that those parties] cannot be regarded as separate legal entities"); 5 COLLIER ON BANKRUPTCY ¶ 548.03 ("[I]f affiliated entities are functionally identical such that bestowing value to one equates to giving value to the other, courts have held that funds [provided] to one will be equivalent value for a payment made or security interest given by the other, effecting a form of consolidation or alter ego analysis.").

Additionally, *Rubin* provides that an indirect benefit amounts to "fair consideration" either when: (i) the "consideration given to the third person has ultimately landed in the debtor's hands;" *or* (ii) when the "giving of the consideration to the third person *otherwise confers an economic benefit upon the debtor* . . . ."  *See* 661 F.2d 979, 991–92 (2d Cir. 1981) (emphasis added).  Had LBP actually purchased the Premises, it is undisputed that the Premises would have been used solely by Cash4Cases and its affiliates, notwithstanding the fact that title to the Premises would have nominally been held by LBP.  The Sale Contract thus conferred to LBP the right to purchase the Premises which, in turn, conveyed a manifest economic benefit to the greater Cash4Cases enterprise: the ability to acquire a new place of business.  The fact that Cash4Cases' books and records may not have reflected the precise value of this benefit is irrelevant.  *See id.* at 993 ("[T]he district court did not err in rejecting the trustees' argument that the corporate separateness of the loan recipients from their guarantors necessarily precluded a finding of fair consideration."); *see also HBE Leasing Corp. v. Frank,* 48 F.3d 623, 638–29 (2d Cir. 1995) (finding, in the context of a DCL claim, that a benefit "advanc[ing] the interests of all [parties] simultaneously" did not need to quantified because, *inter alia*, the benefit was provided in exchange for "payments fall[ing] within a fair range of reasonable compensation"); *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 793 (7th Cir. 2009) ([F]raudulent conveyance doctrine . . . is a flexible principle that looks to substance, rather than form . . . .").

In short, the Trustee's argument discussed above ignores both LBP's legal status as an alter ego of Cash4Cases and the clear economic (albeit indirect) benefit conveyed to Cash4Cases under Sale Contract.  That argument is therefore insufficient to prevent a finding in favor of Defendant.

consideration . . . [so long as] the benefits the debtor receives from the transfer [] *approximate its expected costs*.") (emphasis added).[14]

### ii. *Good Faith*

The "good faith" requirement is also an "indispensable component" of fair consideration under the DCL. *Amusement Industry, Inc. v. Midland Avenue Associates, LLC*, 820 F.Supp.2d 510, 527 (S.D.N.Y. 2011). A transferee lacks good faith when the transferee did not have an honest belief in the propriety of the given activities; had intent to take unconscionable advantage of others; or had intent or knowledge that the given activities would hinder, delay, or defraud others. *See In re Wonderwork, Inc.*, 611 B.R. 169, 209 (Bankr. S.D.N.Y. 2020) (quoting *Staudinger+Franke GMBH v. Casey*, 2015 WL 3561409, at *10 (S.D.N.Y. June 8, 2015)).

In this case, it is undisputed that "there were no facts which would have put Defendant on notice that Cash4Cases was insolvent or would have been rendered insolvent by Plaintiff's payment of the Transfer." [Trustee 7056 Counter-Statement, Doc. 39, p. 9]. Most notably, none of the undisputed facts indicate that the Defendant lacked an honest belief in the propriety of the activities in question, had intent to take advantage of the Debtors, or had intent or knowledge that the activities would hinder, delay, or defraud other creditors of Cash4Cases. *See generally* [Def. Counter-Statement, Doc. 33]; [Trustee 7056 Counter-Statement, Doc. 39]. Accordingly, the Court

---

[14] Although *In re Gonzales* and *In re Jesup* considered the "reasonably equivalent value" required by 11 U.S.C. § 548(d)(2)(A), *see* 342 B.R. at 169; 507 B.R. at 470, this phrase is functionally identical to the "fair consideration" required by the DCL. *See HBE Leasing Corp. v. Frank,* 48 F.3d 623, 638 (2d Cir. 1995) ("Under the UFCA and the *parallel provisions of federal bankruptcy law,* 'fair consideration' is defined quantitatively as 'a fair equivalent' or an 'amount not disproportionately small as compared with the value of the property, or obligation obtained [from the debtor].'") (emphasis added) (citing DCL § 272 and 11 U.S.C. § 548(a)(2)(A)); *see also In re TS Empl., Inc.,* 597 B.R. 494, 524–25 (Bankr. S.D.N.Y. 2019) ("When examining constructive fraud claims, courts use the term fair consideration interchangeably with reasonably equivalent value . . . [and] [t]he only difference is that the state law concept of fair consideration also includes an examination of good faith . . . .") (internal quotations omitted).

finds that Defendant provided fair consideration for the transfer, barring recovery under DCL Sections 273–75.

### D. Actual Fraud Under the DCL

The Trustee has also sought summary judgment with respect to its claim under DCL Section 276, which provides that "[e]very conveyance made and every obligation incurred with *actual intent,* as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law, § 276 (McKinney 2019) (emphasis added); *see also* [Doc. 1, p. 6] (where the Trustee claims that "the [Down Payment] was made with the actual intent to hinder, delay or defraud Cash4Cases' creditors"). The Second Circuit has adopted certain "badges of fraud" as circumstantial evidence of fraudulent intent, which include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the [transferred] property [by the transferor]; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*In re Kaiser,* 722 F.2d 1574, 1582–83 (2d Cir. 1983). Notably, unlike DCL Sections 273–75, "under DCL Section 276, [the debtor] does not need to receive fair consideration for a conveyance to be fraudulent." *Kim v. Ji Sung Yoo*, 311 F.Supp.3d 598, 612 (S.D.N.Y. 2018); *see also Sharp Intl Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.),* 403 F.3d 43, 56 (2d Cir. 2005) ("[W]here actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given.").

With respect to Defendant's "actual intent," and as discussed above, there are no facts indicating that Defendant executed the Sale Contract to defraud other creditors of Cash4Cases.

Indeed, Defendant exhibited none of the Second Circuit's "badges of fraud"—there was fair

consideration from Defendant, no prior relationship between the Cash4Cases' and Defendant, no

improper financial gain by Defendant, no series of questionable transactions or conduct between

the Debtor and Defendant, and no history of improper conduct that would indicate the Debtor

intended to "hinder, delay or defraud" its creditors.  *See In re Kaiser*, 722 F.2d at 1582–83; *see*

*also* [Def. Counter-Statement, Doc. 33]; [Trustee 7056 Counter-Statement, Doc. 39].  The record

thus indicates that Defendant lacked the "actual intent . . . [to] defraud" required by DCL 276.

*See Lippe v. Bairnco Corp.,* 249 F.Supp.2d 357, 375 (S.D.N.Y. 2003) ("[T]he flip side of [the

Second Circuit's] badges of fraud is that their absence . . . constitute[s] evidence that there was

no intent to defraud.").

   The same cannot be said with respect to the intent of Cash4Cases.  It is undisputed that

Cash4Cases was insolvent when Defendant received the Down Payment, *see* [Def. Counter-

Statement, Doc. 33, p. 7], and as discussed above, the evidence presently in the record indicates

that Mr. Birnbaum intended for LBP to hold title to the Premises in order to "shield the Premises

from claims asserted against Cash4Cases and its affiliates."  *See supra*, Part IV(B).  These

circumstances—especially when coupled with the fact that Mr. Birnbaum's fraud conviction

arises from acts that both pre- and post-date the Down Payment—indicates that Cash4Cases made the Down Payment in order to "hinder or delay" its creditors.[15]

Other courts have observed that "[m]any decisions [applying New York Law] have held that a trustee need only prove the transfer*or*'s intent to establish . . . [liability] under DCL § 276." *Schneider v. Barnard*, 508 B.R. 533, 546 (E.D.N.Y. 2014) (emphasis added); *see also Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.,* 234 B.R. 293, 318 (Bankr. S.D.N.Y. 1999); *cf. In re Manhattan Inv. Fund Ltd.,* 310 B.R. 500, 509 (Bankr. S.D.N.Y. 2002) ("[DCL] section 276 [also] requires a showing of the *transferee*'s intent in determining a cause of action for a fraudulent conveyance.") (emphasis in original).  Indeed, one bankruptcy court in this district has found that "[t]he New York state [courts] that have considered . . . whether the transferee's intent must be proved under [] DCL § 276 do not clearly support a conclusion one way or another." *See In re Dreier LLP*, 452 B.R. 391, 432 n.33 (Bankr. S.D.N.Y. 2011) (collecting cases).  It is

---

[15]     Mr. Birnbaum (acting through LBP) and Defendant executed the Sale Contract on March 8, 2019. [Def. Counter-Statement, Doc. 33, p. 4]; [Doc. 28-3].  On September 28, 2021, Mr. Birnbaum was charged with and plead guilty to one count of securities fraud in the Southern District of New York.  *See United States v. Birnbaum*, Case No. 21-cr-00595 (United States District Court for the Southern District of New York, September 28, 2021) [Doc. 9] (the transcript from Mr. Birnbaum's plea hearing).

Count 1 of Mr. Birnbaum's bill of information reads in part:

> From at least *in or about 2017 through in or about 2019*, [Mr. Binbaum] solicited and obtained more than $3 million in investments for Cash4Cases based on fraudulent misrepresentations. These investments were in the form of promissory notes, titled "Investor Security Agreements" ("ISAs"). Among other things, the ISAs purported to provide the relevant investors with a security interest in the recoveries associated with certain specified lawsuits that were ostensibly purchased, in whole or in part, by Cash4Cases. The ISAs also provided that Cash4Cases would repay the investors, with interest, "out of pocket," regardless of the outcome of the lawsuits pledged as collateral. The ISAs typically had one-year terms . . . [Mr. Birnbaum subsequently] caused Cash4Cases to pledge as collateral certain lawsuits that he, in fact, had previously caused to be pledged to other investors or lenders, or previously assigned or sold to other entities. This was contrary to [Mr. Birnbaum]'s representations, under the relevant ISAs, that the collateral pledged to [several investors] was in "good standing" and "free of any liens."

*Id.* at [Doc. 2, pp. 2–3] (emphasis added).

thus unclear whether Cash4Cases' fraudulent intent is, without more, sufficient to satisfy the requirements of DCL Section 276.

However, DCL Section 278(1) provides a defense to claims of both constructive and actual fraud when a transferee receives property "for fair consideration without knowledge of the fraud at the time of the purchase . . . ." *See In re Transcare Corp.,* 2020 WL 8021060, at *32 (Bankr. S.D.N.Y. July 6, 2020), *adopted as modified sub nom. In re TransCare Corp.*, 2021 WL 4459733 (S.D.N.Y. Sept. 29, 2021), *aff'd*, 81 F.4th 37 (2d Cir. 2023); *see also Fed. Deposit Ins. Co. v. Malin,* 802 F.2d 12, 19 (2d Cir. 1986) ("[U]nder section 278, the focus is on the good faith of the *transferee* as opposed to the transferor.").

It is undisputed in this case that Defendant received the Down Payment "[a]s a seller in an arms-length real estate transaction," and that there were otherwise "no facts which would have put Defendant on notice that Cash4Cases was insolvent or would have been rendered insolvent by Plaintiff's payment of the [Down Payment]." [Trustee 7056 Counter-Statement, Doc. 39, p. 9]. The Court has likewise already found that Cash4Cases received "fair consideration" for its in exchange for the Down Payment. *See supra*, Part IV(C). Accordingly, and assuming solely for the purposes of this Motion that the Down Payment could be avoided under these facts, the Court finds that Defendant is entitled to the benefits of the defense provided by DCL Section 278(1).[16] *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995) ("[A] transfer motivated by actual fraudulent intent may not be voided if a transferee who paid fair consideration did not have actual or constructive knowledge of such intent.").

---

[16]    Although Defendant's answer does not specifically reference DCL Section 278(1), it raises that statute's requirements—"fair consideration" and "good faith"—as affirmative defenses to all the claims asserted by the Trustee. *See* [Doc. 4, p. 4].

**E. <u>Section 548 of the Bankruptcy Code</u>**

The Trustee claims that Bankruptcy Code Sections 548(a)(1)(B) and (a)(1)(A) provide a basis by which to avoid the Down Payment. [Doc. 1, pp. 6–7]. Much like the DCL, the Bankruptcy Code has both constructive and actual fraud provisions—Section 548(a)(1)(B) and Section 548(a)(1)(A), respectively—that permit a trustee (or a debtor in possession) to "avoid any transfer . . . made or incurred on or within two years before the date of the filing of the petition . . . ." *See In re Dreier LLP*, 452 B.R. 391, 401 (Bankr. S.D.N.Y. 2011) (delineating Section 548(a)(1)(B) as a constructive fraud provision); *In re Chase*, 372 B.R. 133, 136 (Bankr. S.D.N.Y. 2007) (describing Section 548(a)(1)(A) as an "actual fraud" provision). The Court addresses each provision in turn.

**i.   *Constructive Fraud***

Section 548(a)(1)(B) of the Bankruptcy Code states, in relevant part, that a trustee may avoid a transfer if the debtor:

> (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured . . . .

11 U.S.C.A. § 548(a)(1)(B). The lack of "reasonably equivalent value" is thus a necessary component of a Section 548 constructive fraud claim. *Id.*; *see also In re Akanmu*, 502 B.R. 124, 136 (Bankr. E.D.N.Y. 2013) (holding that fair consideration to the debtor barred the trustee's recovery under Section 548 of the Bankruptcy Code).

The arguments made by the Trustee in support of its constructive fraud claims under the Bankruptcy Code are the same as those used in connection with its constructive fraud claims under the DCL.   [Motion, Doc. 30, pp. 6, 9–10] ("Cash4Cases did not receive any consideration in exchange for the Transfer and therefore the Transfer is avoidable as a fraudulent conveyance."); [Doc. 1, p. 7].   It is, however, well-established that "fair consideration under the [] DCL and reasonably equivalent value under Bankruptcy Code Sections 548(a)(1)(B) and (C) have the same fundamental meaning . . . [and] are interpreted similarly by the courts."  *See In re USA United Fleet, Inc.,* 559 B.R. 41, 60 (Bankr. E.D.N.Y. 2016) (internal quotations omitted); *see also Balaber–Strauss v. Sixty–Five Brokers (In re Churchill Mortgage Inv. Corp.),* 256 B.R. 664, 677 (Bankr. S.D.N.Y. 2000)*, aff'd sub nom. Balaber–Strauss v. Lawrence,* 264 B.R. 303 (S.D.N.Y. 2001) (collecting cases).[17]   The Trustee's arguments under Section 548(a)(1)(B) thus fail for the same reasons already discussed above.  *See supra*, Part IV(C)(i); *see also In re Akanmu*, 502 B.R. 124, 136 (Bankr. E.D.N.Y. 2013); *In re Hong*,  2022 WL 17980826 at *10 (Bankr. E.D.N.Y. Dec. 28, 2022).

### ii.   *Actual Fraud*

Section 548(a)(1)(A) of the Bankruptcy Code states a trustee may void a transfer made within two years of filing a bankruptcy petition if the debtor "made such transfer or incurred such obligation with *actual intent* to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."  11 U.S.C. § 548(a)(1)(A) (emphasis added); *see also Huntington Nat'l Bank v. AIG*

---

[17]      In the constructive fraud context, the only practical difference between Section 548's "reasonably equivalent value" and the DCL's "fair consideration" is that "fair consideration requires showing both an equivalent exchange of value *and* that the asset transferred is received in good faith."  *In re 45 John Lofts, LLC*, 650 B.R. 602, 619 (Bankr. S.D.N.Y. 2023) (emphasis added).

*Specialty Ins. Co.,* 2024 WL 374571, at *10 (6th Cir. Feb. 1, 2024) ("If a trustee may avoid a

transfer under § 548(a)(1), then the trustee may recover, for the benefit of the estate, the property

transferred, or the value of such property, from the initial transferee or subsequent transferee.")

(citing 11 U.S.C. § 550(a)(1)).

As discussed above, the conduct of Mr. Birnbaum and the circumstances otherwise

surrounding the Sale Contract "indicate[] that Cash4Cases made the Down Payment in order to

'hinder or delay' its creditors." *See supra*, Part IV(D) (discussing the applicability of DCL Section

276); *see also In re 45 John Lofts, LLC,* 650 B.R. 602, 611 (Bankr. S.D.N.Y. 2023) (collecting

cases and observing that "[o]nly the intent of the transferor is relevant to the analysis of whether

the transfer was fraudulent"). The Trustee has thus made a *prima facie* showing of the intent

required by Section 548(a)(1)(A).

However, the Court finds that Defendant is entitled to the affirmative defense provided by

Section 548(c), which provides that:

> [a transferee] of [] a transfer or obligation [under Section 548] that *takes for value*
> and *in good faith . . .* may retain any interest transferred or may enforce any
> obligation incurred, as the case may be, to the extent that such transferee or obligee
> gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c) (emphasis added). Thus, "[u]nder the Bankruptcy Code, a transferee may retain

transfers [provided] it took 'for value' and 'in good faith.'" *In re Bernard L. Madoff Investment*

*Securities LLC*, 12 F.4th 171, 178 (2d Cir. 2021) (citing 11 U.S.C. §548(c)); *see also* [Doc, 4 p. 4]

(Defendant's answer to the Trustee's Complaint, where Defendant claims that the Trustee's "claims

are barred in whole or part because Defendant is a transferee in good faith for value under §548(c)

of the Bankruptcy Code").

Both prongs of Section 548(c) are met here. First, as discussed at length above,

Cash4Cases received "fair consideration" in exchange for the Down Payment in accordance with

the under the DCL.  *See supra,* Part IV(C)(i); *In re TS Empl., Inc*., 597 B.R. 494, 524–25 (Bankr. S.D.N.Y. 2019) ("When examining constructive fraud claims, courts use the term fair consideration interchangeably with reasonably equivalent value . . . [and] [t]he only difference is that the state law concept of fair consideration also includes an examination of good faith . . . .") (internal quotations omitted).

Additionally, a showing of good faith typically requires a "subjective, three step inquiry to determine whether the transferee was on inquiry notice of the potential fraud." *In re 45 John Lofts, LLC*, 650 B.R. 602, 615 (Bankr. S.D.N.Y. 2023).  Those three factors are: (i) what the transferee actually knew; (ii) whether "the facts known by the transferee put the transferee on notice of the fraudulent purpose behind a transaction;" and (iii) the extent to which a "diligent inquiry by the transferee would have uncovered the fraudulent purpose of the transfer."  *Id.*

In this case, the parties' submissions indicate that the first two factors weigh in favor of a finding of good faith on the part of Defendant, as "there were no facts which would have put Defendant on notice that Cash4Cases was insolvent or would have been rendered insolvent by Plaintiff's payment of the Transfer," and there is otherwise no indication that Defendant possessed actual knowledge of Cash4Cases' insolvency or Mr. Birnbaum's fraud.  [Trustee 7056 Counter-Statement, Doc. 39, p. 9].

The parties have not discussed the third factor, *see generally* [Motion, Doc. 30]; [Response, Doc. 32]; [Doc. 40]; [Doc. 42], and it is unclear from the record whether Defendant engaged a pre-sale inquiry, or the extent to which a more "diligent inquiry" by Defendant would have uncovered evidence of fraud.  Nonetheless, the Second Circuit has observed that "the duty to conduct a diligent investigation arises *only* when a transferee is actually aware of suspicious facts that would lead a reasonable person in the transferee's position to inquire further into a debtor-transferor's

potential fraud." *See In re Bernard L. Madoff Inv. Securities LLC*, 12 F.4th 171, 196 (2d Cir. 2021) ("Inquiry notice 'signifies actual awareness of suspicious facts that would have led a reasonable [transferee], acting diligently, to investigate further and by doing so discover' a debtor-transferor's fraud.") (emphasis in original); *In re Dreier LLP,* 462 B.R. 474, 489 (Bankr. S.D.N.Y. 2011) ("[T]he duty to inquire is triggered by the acquisition of information that would have caused a reasonable person in the defendant's position to investigate the matter further.") (citing *HBE Leasing v. Frank*, 48 F.3d 623, 636 (2d Cir.1995)); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 23 (S.D.N.Y. 2007) (when considering constructive knowledge, "[t]he issue presented is whether the information [the defendant] learned would have caused a reasonable [party] in its position 'to investigate the matter further.'").

As discussed repeatedly, the parties agree that "there were no facts [that] would have put Defendant on notice that [Cash4Cases] was insolvent or would have been rendered insolvent by [the] payment of the [Down Payment]." *See* [Def. Counter-Statement, Doc. 33, p. 13]. Thus, even if Defendant failed to conduct a preliminary "diligent inquiry," the Court finds that the lack of such an inquiry would not bar a finding of good faith because there were no "suspicious facts" surrounding the Sale Contract that would reflect Cash4Cases' fraudulent intent or imminent insolvency. Defendant is therefore entitled to the protections provided by Section 546(c) of the Bankruptcy Code. *See In re Bayou Group, LLC*, 439 B.R. 284, 308 (S.D.N.Y. 2010) ("After a debtor makes out a prima facie case of actual or constructive fraudulent conveyance [under Section 548(a)], a transferee nevertheless may avoid rescission of a transfer under Section 548(c) of the Bankruptcy Code . . . .").

## CONCLUSION

In conclusion, for the reasons described above, the Court finds that:

(i)    LBP is an alter ego of Cash4Cases in accordance with the factors and reasoning set forth in *Passalacqua. Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131 (2d Cir. 1991), and its progeny;

(ii)   the variance provided by Defendant constituted fair consideration and reasonably equivalent value for Cash4Cases's Down Payment;

(iii)  the Trustee cannot void the transfer of the Down Payment under DCL Sections 273–75;

(iv)   the Trustee cannot recover under DCL Section 276 because there is no fraudulent intent by the Defendant, and because the affirmative defense provided by DCL Section 278(1) bars that claim; and, finally,

(v)    the Trustee cannot avoid the transfer under Section 548 of the Bankruptcy Code because Defendant provided fair value in exchange for the Down Payment, and because Defendant was a transferee in good faith for value under Section 548(c).

The Trustee's Motion. [Doc. 28] and [Doc. 30], is therefore DENIED, and Defendant's

Cross-Motion for Summary Judgment [Doc. 32] is GRANTED.

**IT IS SO ORDERED.**

Dated:  September 24, 2024
New York, New York

/S/ John P. Mastando III
HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE